SKC

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael D. Escobar,<br><br>  Plaintiff,<br><br>v.<br><br>Irene Barron Irby, et al.,<br><br>  Defendants. | No.  CV-23-01740-PHX-JAT (DMF)<br><br>**ORDER** |

Plaintiff Michael D. Escobar, who is currently confined in the Arizona State Prison Complex (ASPC)-Tucson, brought this civil rights action pursuant to 42 U.S.C. § 1983 based on injuries he allegedly suffered while in the custody of the Maricopa County Sheriff's Office (MCSO) at the Maricopa County Lower Buckeye Jail.  Defendants Sergeant Navarro and Detention Officer (DO) Bernardino filed a Motion for Summary Judgment based on failure to exhaust administrative remedies (Doc. 43), and Defendant DO Raymer filed a Joinder in that Motion.  (Doc. 53.)  Plaintiff was informed of his rights and obligations to respond to the Motion and Joinder pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 46, 54), and he filed Responses to both. (Doc. 47, 57.)  Defendants filed Replies.  (Doc. 49, 60.)

The Court will deny the Motion for Summary Judgment and Joinder.

**I.  Background**

Plaintiff's claims arise from an alleged excessive-use-of-force incident on February 16, 2023.  (Doc. 11 at 3−4.)  On screening Plaintiff's three-count Third Amended

Complaint (TAC) under 28 U.S.C. § 1915A(a), the Court determined Plaintiff stated Fourteenth Amendment excessive-use-of-force claims against Defendant DOs Bernardino and Raymer in Count One and a failure-to-intervene claim against Defendant Sgt. Navarro in Count Two. (*Id.* at 6.) The Court dismissed the remaining claims and Defendants. (*Id.* at 7.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.   Facts[1]

####   A.   MCSO Grievance Procedures

MCSO has a multi-level grievance process, set forth in Policy DJ-3, by which detainees "may communicate their concerns or complaints to Office personnel regarding their conditions of confinement." (Doc. 44, Defs.' Statement of Facts (DSOF) ¶ 3; Doc. 44-1, Ex. A, Johns Decl.) ¶ 3; Doc. 44-1 at 10.) MCSO detainees receive the *Informational Handbook for Inmates* (the Handbook), which contains a summary of

---

[1] Although Plaintiff responded to both the Motion for Summary Judgment and Joinder, he filed only a single Separate Statement of Facts (Doc. 58). In it, Plaintiff failed to comply with Rule 56.1(b) of the Local Rules of Civil Procedure and the Court's *Rand* Orders, requiring that, for each paragraph of Defendants' Statement of Facts, he set forth "a correspondingly numbered paragraph indicating whether he disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting" his version of the facts. (*See* Docs. 46 and 54 at 2−3 (quoting LRCiv 56.1(b).) Instead, he merely reiterated in narrative form the facts already set forth in his Responses. (*See* Docs. 47, 57, 58.) The court is mindful of the Ninth Circuit's overarching caution in this context that district courts are to "construe liberally motion papers and pleadings filed by pro se [prisoners] and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.2010). Accordingly, the Court will consider any relevant facts based on personal knowledge in Plaintiff's Responses and Separate Statement of Facts. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (Where the nonmovant is a pro se prisoner, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion). Even though Plaintiff does not explicitly state that his signature on these documents is made "under penalty of perjury," Plaintiff's firsthand statements may be used to oppose Defendants' Motion because, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 418– 19 (9th Cir. 2001); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); *Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144, at *2 (D. Ariz. March 26, 2014) (citing cases) (material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to *avoid*, but not *obtain* summary judgment); *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (at summary judgment, courts "do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents").

MCSO's grievance procedures.  (DSOF ¶ 4; Doc. 44-1 at 82−87.)  Detention Officers pass out grievance forms as part of their daily duties, and detainees may receive grievance forms upon request.  (DSOF ¶ 5.)  Detainees may also file grievances electronically via their tablets.  (*Id.* ¶ 6.)[2]

### 1. First Step: Inmate Grievance

Pursuant to the information provided to Plaintiff in the Handbook, detainees begin the MCSO grievance process by either submitting a paper inmate grievance to detention personnel or by using a tablet to submit an electronic grievance.  (Doc. 44-1 at 83−84.)  The Inmate Grievance must be filed within 72 hours of the incident being grieved, though the 72-hour timeframe is excused for grievances that allege certain types of violations,

---

[2] To set forth the required steps of MCSO's grievance process, Defendants rely on the declaration of Custody Bureau Hearing Unit (CBHU) Commander Chad Johns, whose duties include processing, tracking, and storing grievances, and who is familiar with MCSO's grievance process and with the version of Policy DJ-3 that was in effect at the time of this action. (Doc. 44-1, Ex. A, Johns Decl.)  In his declaration, Johns provides only a cursory summary of the administrative remedy process and, most notably, fails to cite to the policy, itself, or to the Handbook made available to detainees.  Absent citations to the attached evidence, Johns' assertions appear to represent only his own personal knowledge of and/or recollection of the grievance process, not what is set forth in MCSO policy or—more importantly—what is made known to detainees.  (*Id.* ¶¶ 11-23.)  Johns' terminology for the stages of the grievance process and the officials involved in that process also frequently differs from the terminology used in the Handbook, making it difficult to correlate the assertions in his declaration with the particulars of the process as explained to detainees via the Handbook.  Because of these issues, and because the evidence shows that detainees only receive a summary of MCSO's grievance process in the Handbook, and there is no evidence they have access to Policy DJ-3 directly, the Court will rely on the Handbook, not Policy DJ-3 or Defendants' assertions in their Statement of Facts, to establish the relevant steps of the MCSO grievance process.

For clarity and ease of discussion, the Court has distilled the process into what appear to be four or five component steps, although the Handbook itself lacks any such divisions or headings and is, functionally, lacking in critical details, internally inconsistent with its own terminology, and references multiple internal grievance handoffs and/or escalations between supervisory staff that don't specify what, if any, action is required on the part of the detainee at each step, making it difficult to parse MCSO's administrative remedy process into discrete steps or understand the requirements and expectations of the detainee grievant at each step.

- 4 -

including excessive use of force. (*Id.* at 84.) When using a paper grievance, the officer will sign the form and return the pink copy to the detainee with the officer's serial number, date, and time received. (*Id.*) The officer will attempt to resolve the issue within 7 days, and if unable to do so, will forward it to the Shift Supervisor for review. (*Id.* at 84.) The Shift Supervisor, in conjunction with the Shift Commander, if necessary, will review and attempt to resolve the inmate grievance before forwarding it, if necessary to the Hearing Unit. (*Id.*)

### 2. Second Step: Appeal/"Institutional Appeal"

If the detainee does not receive a response to his Inmate Grievance within 7 days, he may file an "appeal" using the "Institutional Appeal Form" if using paper and attaching the pink copy of the original grievance, or by clicking the appeal button if using a tablet. (*Id.*) If the Shift Supervisor or Shift Lieutenant/Commander does not resolve the paper grievance within 7 days, he or she must forward the paper grievance to the Hearing Unit Sergeant as a "formal complaint." (*Id.*) Alternatively, if the grievance is filed electronically, and no response is received, the electronic grievance is automatically forwarded to the next level. (*Id.*)

### 3. Third Step: Formal Complaint

The Hearing Unit Sergeant has 11 days from receipt of the Formal Complaint to attempt to resolve it. (*Id.*) If the detainee is not satisfied with the Hearing Unit Sergeant's response, he may file an "Appeal" by completing the "appeal form" within 72 hours of receiving the response. (*Id.*) If using paper forms, the detainee must attach the yellow copy of his grievance and all responses and attachments, and the Shift Supervisor has 24 hours to forward the appeal to the Hearing Unit for Processing. (*Id.*)

### 4. Fourth Step: Appeal

Once received by the Hearing Unit, "they" have one business day to process and forward the Appeal to the Jail Commander. The Jail Commander must respond to the "tablet appeal" or a paper "*Institutional Grievance Appeal*" within 7 business days from the date it was received. (*Id.*) The Jail Commander or designee may recommend the

dismissal of repetitive or frivolous grievances. (*Id.*) Once the Jail Commander's response is returned to the Hearing Unit, "they" then have "**one (7)** [sic] business day from the time of receipt to process it and return it" back to the detainee. (*Id.* (emphasis and contradiction in original).) If the issue is still unresolved, the detainee has 72 hours from receipt of the Jail Commander's response to file an "*Inmate External Grievance Appeal Form*" with the yellow copies of the "*Grievance Form*" and the "*Institutional Grievance Appeal Form*" if using paper or may click the appeal button on the tablet if using a tablet. (*Id.*)

### 5.     Fifth Step: Inmate External Grievance Appeal

The Bureau Hearing Unit (BHU) Commander or designee has 7 workdays after receipt of the External Grievance Appeal to review it and determine if it will go forward. (*Id.*) If the BHU Commander or designee determines the appeal is frivolous, repetitive, without merit, or relates to a non-grievable issue, the BHU Commander will forward it to the Bureau Chief who will review, respond to, and return it to the BHU Commander within 14 days. (*Id.*) If the BHU Commander agrees with the Bureau Chief's decision, this ends the grievance process. Otherwise, the External Appeal will go forward, and the External Referee will have 30 calendar days to respond. (*Id.* at 84−85.)[3] The External Referee's response and written decision ends the formal grievance process. (*Id.* at 85.)[4]

If the "grievance" contains allegations of staff misconduct, and if, after review by the Bureau Hearing Unit, it is found to be valid, the grievance will be forwarded to the Professional Standards Bureau, and "[t]his will end the grievance process, and the grievance will then be treated as an external complaint." (*Id.*)[5]

. . . .

---

[3] It is not clear how or when the detainee grievant is notified of this decision.

[4] Again, the Handbook does not specify when or how the detainee grievant is informed of this result.

[5] It is not clear from the Handbook at what stage this determination is made, how the detainee is notified, or what it means that the "grievance" is treated as an "external complaint."

### B.     Plaintiff's Grievances

In the usual course of business, MCSO maintains a copy of inmate grievances and appeals and the responses from staff and the External Referee. (*Id.* ¶ 7.) MCSO logs the grievances and includes the grievance date, the inmate booking number, and the category of the grievance. (*Id.* ¶ 8.) CBHU Commander Johns searched MCSO's grievance records for Plaintiff between January 1, 2023 and December 31, 2023. (*Id.* ¶ 9.) Based on these records, Plaintiff submitted and escalated several grievances during this period. (*Id.* ¶ 11.) In his Response, Plaintiff produced copies of paper grievances—not produced by Defendants or addressed by CBHU Commander Johns—that he also filed during the relevant time of his claim. (Doc. 47 at 5−7.)[6]

#### 1.     Paper Grievances

On February 27, 2023, Plaintiff asked Defendant Bernadino to sign a paper grievance about the February 16, 2023 incident, and Defendant Bernadino refused to sign it, but he gave Plaintiff a tablet that was registered to a different detainee. (Doc. 47 at 2; Doc. 58 at 2.) That same day, Plaintiff asked Sgt. Rushing to sign a paper grievance about the February 16, 2023 incident, and Sgt. Rushing also refused to sign it, saying Plaintiff cannot grieve disciplinary issues. (*Id.*)  Although Plaintiff does not cite to the specific grievance Sgt. Rushing refused to sign, he produced copies of three separate paper grievances dated February 27, 2023. (Doc. 47 at 5−7.) In the first of these, Plaintiff references the assault but chiefly complains about Defendant Bernardino's disciplinary reports against Plaintiff arising from the incident. (*Id.* at 5.)

When Sgt. Rushing refused to sign Plaintiff's paper grievance, Plaintiff asked her to help him transfer his identifying information onto the tablet since the tablet was

---

[6] It is not clear why, if MCSO keeps records of all detainee grievances, and Defendants produced all the grievances on file for Plaintiff at the relevant time, as CBHU Commander Johns asserts, Defendants failed to produce any of Plaintiff's paper grievances about the February 16, 2023 use-of-force incident, even though the copies Plaintiff produced all contain staff signatures and badge numbers at each level of review (*See* Doc. 47 at 5−7), indicating they were received and, based on Defendants' facts, should have been logged with copies of them kept in MCSO files.

registered to a different detainee, but Sgt. Rushing instead grabbed the tablet away from Plaintiff, saying it did not belong to him. (*Id.* at 2; Doc. 58 at 2.)  Since Plaintiff did not have a tablet to file an electronic grievance, he waited until the graveyard shift and was finally able to get a graveyard shift officer to sign and turn in his paper grievances. (*Id.*)

The copies Plaintiff produced of his February 27, 2023 Inmate Grievances show they were all received by the same officer, identified only by badge number B4755, between 2335 and 2340 hours on February 27, 2023, and they were assigned sequential grievance numbers 23-01441, 23-01442, and 23-01443. (Doc. 47 at 5−7.)  The standard MCSO "Inmate Grievance Form" Plaintiff used contains the following five sections: (I) "Grievance (to be completed by inmate)," (II) "Officer Action Taken to Resolve," (III) Sergeant Action Taken to Resolve," (IV) "Shift Commander Action," and (V) "Custody Bureau Hearing Unit Action (formal)." (*Id.*)[7]

In Section I of Grievance number 23-01442, Plaintiff wrote,

> On Feb 16 around 2:30−3:40 a[n] incident occurred & Sgt. Navarro B3250 was present when a[n] assault on inmate (me) by[] Maricopa County Officer happened in the celly port of level 2-23-B.  Everything is on footage & I had second shift take photos of my injur[ie]s.  I will be filing a civil case with the NAACP [and] my resolution is accountability/integrity.

(*Id.* at 6.)  In Grievance number 23-01443, Plaintiff made a nearly identical complaint and further alleged that a written report was done on the "use of force & assist to the ground." (*Id.* at 7.)  In this grievance, he identified Officer Raymer, B4100, as being involved in the excessive force and assault. (*Id.*)

---

[7] Though not immediately apparent on the facts presented, it appears these sections all correlate only to the first step of the MCSO grievance process, as set forth in the Handbook, wherein the officer must first attempt to resolve the issue within 7 days, and if he or she is unable to do so, the officer must forward the Inmate Grievance to the Shift Supervisor for review, and the Shift Supervisor, in conjunction with the Shift Commander, if necessary, must attempt to resolve it before forwarding it, if necessary, to the Hearing Unit. (Doc. 44-1 at 84.)  As noted, the Handbook's description of this process does not clarify whether the detainee is involved, notified, or has any responsibility during this multi-level progression up the chain of command.

Of the remaining sections on the paper form, Section II, "Officer Action" is blank on all three grievances. (*Id.* at 5−7.) The remaining sections, Sections III−V, for "Sergeant Action," "Shift Commander Action," and "Custody Bureau Hearing Unit Action," each contain staff signatures, and they all state only that the paper grievance is a duplicate to 235586282, which is Plaintiff's electronic grievance. (*Id.*) The staff responses are dated, respectively, April 14, 2023, May 5, 2023, and May 12, 2023. (*Id.*)

## 2.  **Electronic Grievances**

On March 8, 2023, Plaintiff "luckily" received a tablet from other detainees since MCSO Defendants and employees "with authority" to provide one were not helping him. (Doc. 47 at 3.) That day, Plaintiff submitted an electronic grievance based on the alleged excessive-use-of-force incident on February 16, 2023. (DSOF ¶ 24.) This grievance was assigned No. 235586282. (*Id.*) In it, Plaintiff alleged he was subjected to excessive force by MCSO DOs and a Sergeant, resulting in injuries. (*Id.* ¶ 25.)

On March 22, 2023, Sgt. Johanning made a note in Plaintiff's electronic grievance record, stating, "No response from staff at level 1.[8] Grievance is being closed to give the inmate the opportunity to appeal to the next level." (*Id.* ¶ 26; Doc. 44-1 at 92.)

On March 23, 2023, Plaintiff filed an electronic grievance appeal regarding this entry, stating,

> I'm appealing because… How can it be said to me that there was no response from level 1?? I'm not even sure what that['s] suppose[d] to mean.[] I should at least get a forward up the chain of command response on this or something. I'm upset that your officers can just close my grievance without any information provided to me on this issues.. It[']s clearly wrong and against my civil rights.[] I feel like it[']s trying to be swept

---

[8] As previously noted, the Handbook does not identify or delineate the MCSO grievance process according to numeric levels or ever refer to "level 1." Also, inferring that "level 1" refers to the initial paper or electronic grievance, it appears the initial grievance is internally forwarded through numerous levels of staff with similar and overlapping titles to later staff, so the precise level number of a particular grievance or appeal or how it corresponds with staff titles and other terminology in the Handbook is particularly unclear.

- 9 -

>under the rug by[] mcso.[]  I'm not going to let this go.[]  I promise if I don't get anyone higher th[a]n a captain to let me know how mcso can make this right I will keep pursuing this civil lawsuit against MCSO LBJ and I will be requesting to press charges against officer Raymer B4100!

(Doc. 44-1 at 92.)

On March 27, 2023, Plaintiff "was physically assaulted for the second time and treated the same as [the February 16, 2023] incident like an aggressor and disciplined and moved to solitary confinement over at 4th Avenue Jail."  (Doc. 47 at 3.)  The officers at the 4th Avenue Jail took all of Plaintiff's belongings, so he no longer had a tablet and "could not follow along with the [administrative remedy] process."  (Doc. 47 at 3.)

Meanwhile, the Shift Supervisor did not timely respond to Plaintiff's electronic appeal, so on April 4, 2023, the electronic appeal was automatically escalated to the next level of review.  (DSOF ¶ 27.)  The April 4, 2024 entry in Plaintiff's electronic grievance record states, "From 2 to 3 due to automatic escalation."  (Doc. 44-1 at 92.)

On April 14, 2023, Sgt. Johanning entered a staff response, stating, "CBHU has not received the PIR for this grievance yet.  When we do, it will be reviewed and if needed sent to the Professional Standards Bureau for a final review."  (DSOF ¶ 28; Doc. 44-1 at 92.)  That same day, Sgt. Johanning changed the status of Plaintiff's grievance "From 'Open' to 'Closed.'"  (*Id.*)  There are no further entries in Plaintiff's electronic grievance record.  (*See* Doc. 44-1 at 91−92.)

Based on CBHU Commander Johns' search of Plaintiff's MCSO grievance records, there is no record Plaintiff escalated the grievance process further.  (*Id.* ¶¶ 29−30.)  According to Plaintiff, Plaintiff was unable to appeal Sgt. Johanning's response because he did not have a tablet for two months, and his requests for a tablet were denied, so he could not access his grievance or get any notifications about it. (Doc. 47 at 3−4.; Doc. 58 at 3−4.) When Plaintiff got access to another tablet and was able to check on his electronic grievance, he saw that it had already been closed for two months. (*Id.*)  He also found out that his paper grievances had been denied as duplicates of the electronic grievance. (*Id.*)
. . . .

## IV. Exhaustion Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

## V. Discussion

Defendants have shown that MCSO has an administrative remedy process, which is

set forth in Policy DJ-3 and made known to detainees through a written summary in the Handbook. Defendants have also shown that Plaintiff utilized this process to grieve the alleged excessive-use-of-force incident on February 16, 2023, but he did not exhaust his administrative remedies by filing a final Inmate External Grievance Appeal.

To survive summary judgment for failure to exhaust, Plaintiff must therefore show that he either did exhaust his administrative remedies or that "there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

In *Ross v. Blake*, the Supreme Court held that "[a] prisoner need not exhaust remedies if they are not 'available.'" 578 U.S. 632, 635 (2016). In determining when administrative remedies are not "available," the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citing *Booth v. Churner*, 532 U.S. 731, 736, 738 (2001)). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Ross*, 578 U.S. at 643−44. And finally, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

### A.     Incapable of Use

As noted in the fact section, *supra*, the administrative remedy process as set forth in the Handbook MCSO detainees receive is perilously close to being "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 578 U.S. at 643−44. In part, the written summary in the Handbook does not contain any headings or numerical labels to delineate each of the discrete steps a detainee grievant must follow to complete the

administrative remedy process.  Additionally, each apparent step focusses almost entirely on the actions of the various administrators and grievance personnel in coordination with each other, not on the rights or responsibilities of the detainee grievant during the process. For instance, although some levels of review at both the beginning and end of the process appear to route the compliant through a chain of command, involving numerous staff, the Handbook fails to specify how or when a detainee is notified of staffs' attempts to resolve his issue or what specific actions, if any, the detainee must take during this process.  The instructions, as written, also do not use consistent terminology. (Doc. 44-1at 84−85.) Even within each apparent level of the review process, the Handbook may alternate between referring to a particular type of grievance or grievance form in either capitalized or non-capitalized terms or refer to it only generically as a "grievance" or "appeal," making it difficult to correlate each step of the process to a particular type of grievance or grievance form. (*Id.* at 84.)  The instructions also appear to require filing an institutional level appeal at two different stages of the process, further confusing the sequence of steps.  (*Id.*) Compounded together, these issues result in a process that is, on its face, so opaque that there is at least a question of fact that "no ordinary prisoner can discern or navigate it." *Ross*, 578 U.S. at 643−44.

**B.     Thwarting through Machination, Misrepresentation, or Intimidation.**

Plaintiff's documented attempts to utilize MCSO's administrative remedy process also raise a question of fact whether officers thwarted him from taking advantage of that process "through machination, misrepresentation, or intimidation." *Id.* at 644.  Based on Plaintiff's first-hand account, when Plaintiff initially attempted to submit paper grievances about the February 16, 2022 incident, two separate staff members—Defendant Bernadino and Sgt. Rushing—independently refused to accept and sign Plaintiff's grievances, and Sgt. Rushing refused to help Plaintiff submit an electronic grievance and, instead, immediately confiscated the tablet Defendant Bernadino gave Plaintiff, purportedly for this purpose. (Doc. 47 at 2; Doc. 58 at 2.)  Although Plaintiff persisted and was able to get a graveyard shift officer to agree to accept and sign his paper grievances, the "Officer

Action" section of those grievances is blank. (Doc. 47 at 5−7.) Construing this evidence in Plaintiff's favor, the officer who accepted and signed Plaintiff's grievances also failed to make any attempts to resolve Plaintiff's complaints.

On this evidence, a reasonable fact finder could conclude that the above officers, through a combination of either intentional obstruction or negligence, thwarted Plaintiff from taking advantage of the MCSO administrative remedy process.

### C.     Simple Dead End

The above evidence, coupled with the ongoing failures of MCSO officials to respond to Plaintiff's further attempts to utilize MCSO's administrative remedy process also support the inference that the process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 644.

First, there is no evidence Plaintiff received any responses to his paper grievance prior to March 8, 2023 when he was able to acquire another tablet and restart the grievance process electronically. The remaining sections of the paper grievance form that Plaintiff submitted show that, after Plaintiff submitted this Inmate Grievance on February 27, 2023, and the graveyard shift officer signed and accepted it but took no apparent action to resolve Plaintiff's complaint, each subsequent official simply rejected the paper grievance as a duplicate of Plaintiff's electronic grievance, effectively ending Plaintiff's initial attempt to resolve his complaints through the paper grievance process. (*See id.*)

Even though Plaintiff had, by then, begun to pursue his administrative remedies via tablet, and he therefore theoretically still had administrative remedies available to him, his attempts to utilize the electronic grievance process evince a similar pattern of officials being "unable or consistently unwilling to provide any relief." *Ross*, 578 U.S. at 643.

As with Plaintiff's paper grievance, Plaintiff's electronic grievance records show that, after Plaintiff started over on a tablet, he again received "no response from staff at level 1." (Doc. 44-1 at 92.) Sgt. Johanning, who made this note, then inexplicably closed Plaintiff's electronic grievance, even though, according to the Handbook, if staff fail to respond to an electronic grievance within 7 days, the grievance is automatically forwarded

to the "next level," not closed. (*Id.* at 84.) Sgt. Johanning explained that he closed the grievance, "to give the inmate the opportunity to appeal to the next level" (*id.*); however, there are no policies saying an electronic grievance must be "closed" to give a grievant the opportunity to appeal, and this explanation is, itself, nonsensical because a detainee would have no reason to believe he could appeal a closed grievance; nor is this process ever explained in the Handbook. Understandably confused, Plaintiff responded to Sgt. Johanning's entry by stating he did not even know what it meant, and he complained that he should "at least get a forward up the chain of command response on this or something" and he felt like his issue was being "swept under the rug." (*Id.* at 92.) Plaintiff's experience to this point encapsulates what the Supreme Court identified in *Ross* as being stuck in a process that "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 644.

Ultimately, Plaintiff received only one response to his March 8, 2023 electronic grievance, five weeks later, on April 14, 2023. By then, according to the notes in Plaintiff's electronic grievance records, Plaintiff's initial grievance had already been closed because staff failed to respond, but Plaintiff successfully "escalated" the grievance by "appealing" its closure on March 23, 2023. (*Id.*) Once again, however, staff failed to respond, and this time, on April 4, 2023, the level changed "from 2 to 3 due to automatic escalation." (*Id.*)[9] Finally, on April 14, 2023, Sgt. Johanning responded for the first time to the substance of Plaintiff's complaint, but he once again closed the grievance and implied no further relief was available, saying only that "CBHU has not received the PIR for this grievance yet. When we do, it will be reviewed and if needed sent to the Professional Standards Bureau

---

[9] Once again, it is difficult to correlate the terminology in Plaintiff's electronic grievance responses to the steps set forth in the Handbook, which does not refer to the steps of the administrative grievance process by levels or use numbers, and which appears to include multiple levels of review within only the first step of the process. The Handbook also does not use the terms "open" and "closed" in its description of the administrative remedy process or explain what they mean. Absent any such instruction, a reasonably diligent detainee could infer that the term "closed" means the process has concluded and no further remedies are available.

for a final review." (*Id.*)

Inferring from context that the "PIR" is a report on the February 16, 2023 use-of-force incident and that having that report would aid staff in investigating Plaintiff's complaint, this response notably lacks any indication or assurance that staff would affirmatively attempt to obtain the report, now two months after the incident took place, or that Plaintiff would be apprised of the results  Of more concern, the response is completely open-ended, saying only that, at some theoretical point in the future—*if* the CBHU received the PIR—the PIR would be "sent to the Professional Standards Bureau for a final review." (*Id.*)  Upon receiving this noncommittal response, an ordinary detainee would have no basis to infer that he would ever be informed of any staff actions to resolve his complaint or that he had any remedies left to pursue. *See Brown*, 422 F.3d at 937 ("information provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'").  And it would be reasonable for Plaintiff to infer from this response that no further administrative remedies were available. *See Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) (where prisoner relied on misleading information provided by warden during the grievance process, even though there was no bad faith or deliberate obstruction by warden, administrative remedies were effectively unavailable)*; Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010) (improper screening of an inmate's grievance, failing to provide grievance forms, and providing inaccurate information to an inmate during the grievance process have been found to constitute circumstances rendering administrative remedies unavailable) (citing cases); *Marella v. Terhune*, 568 F.3d 1024, 1027 (9th Cir. 2009) (holding that if a plaintiff was unable to file grievance forms or if he was reliably informed that administrative remedies were not available, exhaustion is not required).

Plaintiff has also shown that, even apart from these issues, he did not have any administrative remedies available to him to timely grieve the excessive-use-of-force incident after Sgt. Johanning responded to his electronic grievance on April 14, 2023 because, prior to that, on March 27, 2023, he was again assaulted, and as a result, he was

1  moved to new jail facility, where officers took his belongings, and he no longer had access
2  to a tablet. (Doc. 47 at 3.) Based on these undisputed facts, Plaintiff had no way to check
3  the status of his electronic grievance or file any more electronic grievances or appeals.

4  Defendant Raymer argues that Plaintiff still had administrative remedies available
5  to him because, under Policy DJ-3, "[w]hen an inmate doesn't have access to a tablet, he
6  may inform officers that he requires a paper grievance form." (Doc. 60 at 3.) Defendant
7  Raymer then argues that Plaintiff does not present any evidence "showing he requested a
8  grievance form to follow-up on his electronic grievance." (*Id.*) He also argues, without
9  explanation, that the April 14, 2023 rejection of Plaintiff's prior paper grievance as a
10 duplicate of his electronic grievances "doesn't show [Plaintiff] was preventing from
11 exhausting his electronic grievance, which he submitted on March 8, 2023." (*Id.*)

12 These arguments fail for several reasons. First, Defendant Raymer only generally
13 cites to page 3 of Policy DJ-3 for the proposition that detainees who do not have access to
14 a tablet may request paper grievances, but the cited page does not contain any information
15 about how detainees are to obtain paper grievances.[10] Additionally, as already noted,
16 Defendants have not presented any evidence that detainees, including Plaintiff, have access
17 to Policy DJ-3. Moreover, even if detainees are informed that they may request paper
18 grievances from staff in lieu of submitting electronic grievances, Defendants do not point
19 to any provision in Policy DJ-3 or the Handbook that instructs detainees on how to continue
20 the electronic grievance process if they lose access to a tablet at some point during that
21 process. Also, because the evidence shows that Plaintiff's paper grievances were all
22 rejected as duplicates of his electronic grievance after Plaintiff started the electronic
23 grievance process, the evidence does not support that Plaintiff could simply switch back to
24 filing paper grievances in an attempt to finish the electronic grievance process or that, if he
25 did, these would not likewise be rejected as duplicates. In short, Defendants point to no

---

[10] Defendant Raymer cites to Doc. 44-1 at 12, which is Defendants' attachment of Policy DJ-3, *Inmate Grievance Procedures*, but the cited page only contains provisions regarding the timeline for submission of an Inmate Grievance or an Emergency Grievance.

MCSO policies that cover Plaintiff's situation or any evidence that would suggest that, after a tablet was taken away from him for a second time, Plaintiff had any further administrative remedies available to him to grieve his alleged assault, either through the electronic grievance process, which was only available via tablet, or by attempting to switch back to filing paper grievances.

The evidence also shows that, by the time Plaintiff regained access to a tablet, two months had passed since Sgt. Johanning closed his electronic grievance, when according to the Handbook, Plaintiff had only 72 hours to file an appeal. (Doc. 44-1 at 84.) Moreover, as already discussed, even if Plaintiff had some means of becoming aware of Sgt. Johanning's April 14, 2023 response to his electronic grievance at the time, he could have reasonably concluded that this response, itself, together with the change in status of his electronic grievance from "open" to "closed," meant that no further administrative remedies remained available to him. The Ninth Circuit has held that "a prisoner need not press on to exhaust further levels of review once he has either received all 'available' remedies at an intermediate level of review or been reliably informed by an administrator that no remedies are available." *Brown*, 422 F.3d at 935.

In summary, there are questions of fact whether the opaque instructions in the Handbook, staff obstructions, and grievance staffs' repeated failures to respond to Plaintiff's grievances or make any attempt to provide relief made MCSO's administrative remedy process effectively unavailable. But even setting these issue aside, the evidence shows Plaintiff made numerous attempts to grieve the February 16, 2023 excessive-use-of-force incident in accordance with MCSO's administrative remedy process and that, as of at least March 27, 2023, when he lost access to a tablet for a second time, no further administrative remedies were available to him to seek redress for that incident.

Because the PLRA only requires exhaustion of "available" administrative remedies, Plaintiff was not required to do more before filing this action. The Court will therefore deny Defendants' Motion for Summary Judgement/Joinder based on failure to exhaust and will sua sponte rule in Plaintiff's favor on exhaustion. *Albino*, 747 F.3d at 1176.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment based on failure to exhaust and Joinder in that Motion (Doc. 43, 53), and the Motion and Joinder are **denied**.

(2) Summary Judgement is sua sponte **granted** to Plaintiff on the issue of exhaustion. *Albino*, 747 F.3d at 1176.

(3) Pursuant to the Court's Order at Doc. 56, Defendants will have **45** days from the date of this Order to file a renewed motion for summary judgment on the merits.

Dated this 25th day of July, 2025.

*/s/ James A. Teilborg*
James A. Teilborg
Senior United States District Judge